KENNETH ROBINSON, AN INFANT BY HIS PARENT AND GUARDIAN AD LITEM, ERNESTINE ROBINSON, *ET AL.*, PLAINTIFFS-RESPONDENTS, v. WILLIAM T. CAHILL, GOVERNOR OF THE STATE OF NEW JERSEY, *ET AL.*, DEFENDANTS-APPELLANTS.

Argued March 18, 1975—Decided May 23, 1975.

334

*Honorable Brendan T. Byrne,* pro se, and *Mr. Lewis B. Kaden,* Special Counsel to the Governor, argued the cause for appellant Governor of the State of New Jersey. (*Mr. V.aden,* of counsel and on the brief; *Mr. John J. Degnan, Ms. Judith Nallin,* and *Mr. Arthur Winkler,* Assistant Counsel to the Governor, on the brief).

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for appellants Treasurer of the State of New Jersey, Commissioner of Education of the State of New Jersey, New Jersey State Board of Education, and State of New Jersey (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Skillman,* of counsel and on the brief, *Ms. Jane Sommer,* Deputy Attorney General, on the brief).

*Mr. David Goldberg* argued the cause for appellants President of the Senate of the State of New Jersey and the Senate of the State of New Jersey. (*Messrs. Warren, Goldberg, and Berman,* attorneys).

*Mr. Jack Borrus* argued the cause for appellants Speaker of the General Assembly of the State of New Jersey and the General Assembly of the State of New Jersey (*Messrs. Borrus, Goldin and Foley,* attorneys; *Mr. Borrus,* of counsel and on the statement in lieu of brief; *Mr. David M. Foley,* on the statement in lieu of brief).

Mr. *Harold J. Ruvoldt, Jr.* argued the cause for respondents (*Messrs. Ruvoldt and Ruvoldt,* attorneys and Special Counsel to *Mr. Dennis L. McGill,* Corporation Counsel of the City of Jersey City, *Mr. Frank H. Blatz, Jr.,* Corporation Counsel of the City of Plainfield, *Mr. Joseph LaCava,* Corporation Counsel of the City of Paterson, and *Mr. Julius Fielo,* Corporation Counsel of the City of East Orange).

Mr. *Paul L. Tractenberg and Mr. David G. Lubell,* of the New York bar, argued the cause for *amici curiae* Education Committee, Newark Chapter, National Association for the Advancement of Colored People and American Civil Liberties Union of New Jersey (*Messrs. William J. Bender and Frank Askin,* attorneys).

Mr. *William J. Zaino* argued the cause for *amicus curiae* New Jersey School Boards Association.

Mr. *Cassel R. Ruhlman, Jr.* argued the cause for *amicus curiae* New Jersey Education Association (*Messrs. Ruhlman and Butrym,* attorneys).

Mr. *Andrew T. Berry* argued the cause on behalf of *amici curiae* Township of Livingston and the Boards of Education of the School Districts of Montclair, Berkeley Heights, Chatham Township, New Providence, Rumson, Sandyston-Walpack, Summit and Millburn, Avon-by-the-Sea, Belmar, Englewood, Mendham Township, and the City of Englewood and the Mayor of the Borough of Carlstadt (*Messrs. McCarter and English,* attorneys for *amici curiae* Township of Livingston and the Boards of Education of the School Districts of Montclair, Berkeley Heights, Chatham Township, New Providence, Rumson, Sandyston-Walpack, Summit and Millburn; *Mr. Berry* of counsel and on the brief; *Mr. Peter F. Shebell, Jr.* filed a brief on behalf of *amici curiae* Boards of Education of Avon-by-the-Sea and Belmar; *Mr. Walter T. Wittman,* attorney for *amicus curiae* Board of Education of City of Englewood; *Mr. Arthur W.*

*Lesemann,* attorney for *amicus curiae* City of Englewood; *Messrs. Mills, Doyle, Hock* and *Murphy* filed a brief on behalf of *amicus curiae* Board of Education of Township of Mendham, *Mr. Eugene F. Doyle,* of counsel and on the brief; *Mr. Paul S. Barbire* filed a brief on behalf of *amicus curiae* Mayor of the Borough of Carlstadt).

*Mr. Bruce LaCarrubba* appeared on behalf of *amicus curiae* New Jersey State Office of Legal Services.

*Mr. Martin L. Greenberg,* Member of the Senate of the State of New Jersey filed a brief pro se and on behalf of *Ms. Anne Martindell and Messrs. Alexander Menza, Joseph P. Merlino and John Russo,* Members of the Senate of the State of New Jersey (*Mr. Stephen N. Dratch,* on the brief).

*Mr. Anthony Scardino, Jr.,* Member of the Senate of the State of New Jersey, filed a statement in lieu of brief pro se.

*Mr. Thomas H. Kean,* Member of the Assembly of the State of New Jersey filed a statement in lieu of brief pro se and on behalf of *Messrs. William J. Bate* and *James W. Bornheimer, Ms. Jane Burgio, Ms. Mary Keating Croce, Ms. Barbara A. Curran, Messrs. Walter E. Foran, Kenneth A. Gewertz, Francis J. Gorman, Robert P. Hollenbeck, Alan J. Karcher, Robert E. Littell, Carl A. Orechio, George J. Otlowski, Victor A. Rizzolo, Robert M. Ruane, C. Gus Rys, Clifford W. Snedeker, John A. Spizziri, A. Donald Stewart, Ms. Rosemarie Totaro* and *Messrs. Richard F. Visotcky and Karl Weidel,* Members of the Assembly of the State of New Jersey.

*Mr. George J. Otlowski,* Member of the Assembly of the State of New Jersey, filed a statement in lieu of brief pro se.

*Mr. Alan J. Karcher,* Member of the Assembly of the State of New Jersey, filed a statement in lieu of brief pro se.

*Mr. Herbert C. Klein,* member of the Assembly of the State of New Jersey, filed a brief pro se.

*Mr. Robert B. Meyner* submitted a brief on behalf of *amicus curiae* Morris School District (*Messrs. Meyner, Landis and Verdon,* attorneys; *Mr. Jeffrey L. Reiner,* on the brief).

*Mr. Milton A. Buck,* Corporation Counsel for the City of Newark, submitted a brief on behalf of *amicus curiae* City of Newark (*Ms. Rosalind L. Bressler,* Assistant Corporation Counsel, on the brief).

*Mr. James D. Checki, Jr.* submitted a brief on behalf of *amicus curiae* Board of Education of Township of Lyndhurst (*Messrs. Checki and Politan,* attorneys).

*Mr. Robert T. Pickett* submitted a brief on behalf of *amicus curiae* The Education Reform Project of The Greater Newark Urban Coalition (*Messrs. Pickett and Jennings,* attorneys; *Messrs. David C. Long* and *Daniel M. Schemker* on the brief).

*Mr. Morton Feldman* submitted a brief on behalf of *amici curiae* Pleasantville Taxpayers Association, Weymouth Taxpayers Association, Association of Concerned Citizens of Vineland and Gilbert Cramer.

The opinion of the Court was delivered by
HUGHES, C. J. The Court has now come face to face with a constitutional exigency involving, on a level of plain, stark and unmistakable reality, the constitutional obligation of the Court to act. Having previously identified a profound violation of constitutional right, based upon de-

fault in a legislative obligation imposed by the organic law in the plainest of terms,[1] we have more than once stayed our hand, with appropriate respect for the province of other Branches of government. In final alternative, we must now proceed to enforce the constitutional right involved.

The compulsion upon the Court to act in the present state of affairs is evident:

> The people's constitutional reposition of power always carries with it a mandate for the full and responsible use of that power. When the organic law reposes legislative power in that branch, for instance, it is expected that such power will be used, lest it wither and leave the vacuum of a constitutional exigency, requiring another branch (however reluctantly) to exercise, or project the exercise of, that unused power for the necessary vindication of the constitutional rights of the people. *Robinson v. Cahill*, 62 *N. J.* 473 (1973), *cert.* den. *sub nom. Dickey v. Robinson*, 414 *U. S.* 976, 94 *S. Ct.* 292, 38 *L. Ed.* 2d 219; *Jackman v. Bodine*, 43 *N. J.* 453 (1964); *Asbury Park Press, Inc. v. Woolley*, 33 *N. J.* 1 (1960). [*American Trial Lawyers v. N. J. Supreme Ct.*, 66 *N. J.* 258, 263]

In *Robinson v. Cahill*, 62 *N. J.* 473 (1973), we held violative of the Education Clause of the Constitution the existing system of education provided public school children in this State. We construed the Constitution basically to command that the State afford "an equal educational opportunity for children" (*Id.* at 513), however the burden of doing so would be distributed and borne,[2] and we agreed

---

[1]"The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the [school] children in the State * * *." [*N. J. Const.* (1947), Art. VIII, § IV, ¶ 1; see *N. J. Const.* (1844), Art. IV, § VII, ¶ 6, as amended, effective Sept. 28, 1875]

[2]"* * * [I]t cannot be said the 1875 amendments were intended to insure statewide equality among taxpayers. But we do not doubt that an equal educational opportunity for children was precisely in mind. The mandate that there be maintained and supported 'a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years' can have no other import. Whether the State acts directly or imposes the role upon local government, the end product must be

with the determination of Judge Botter (118 *N. J. Super.* 223, 119 *N. J. Super.* 40 (Law Div. 1972)) that "the constitutional demand had not been met * * *" on the basis of gross "discrepancies in dollar input [expenditure] per pupil." 62 *N. J.* at 515. We so ruled because dollar input was "plainly relevant and because we [had] been shown no other viable criterion for measuring compliance with the constitutional mandate." *Id.* at 515–16.[3]

Thus we considered as the principal cause of the constitutional deficiency the substantial reliance (under our present system of financing education) upon local taxation, entailing as it does "discordant correlations between the educational needs of the school districts and their respective tax bases." *Id.* at 520.

Nevertheless, although we expressed doubt that the Constitution could be satisfied "by reliance upon local tax-

what the Constitution commands. A system of instruction in any district of the State which is not thorough and efficient falls short of the constitutional command. Whatever the reason for the violation, the obligation is the State's to rectify it. If local government fails, the State government must compel it to act, and if the local government cannot carry the burden, the State must itself meet its continuing obligation." [*Robinson v. Cahill, supra* 62 *N. J.* at 513]

[3]While we recognized "that there is a significant connection between the sums expended and the quality of the educational opportunity" (62 *N. J.* at 481), the record of this case and the material furnished us in preparation for argument demonstrate that a multitude of other factors play a vital role in the educational result — to name a few, individual and group disadvantages, use of compensatory techniques for the disadvantaged and handicapped, variation in availability of qualified teachers in different areas, effectiveness in teaching methods and evaluation thereof, professionalism at every level of the system, meaningful curricula, exercise of authority and discipline, and adequacy of overall goals fixed at the policy level. Hence while funding is an undeniable pragmatic consideration, it is not the overriding answer to the educational problem, whatever the constitutional solution ultimately required.

Moreover, while we dealt with the constitutional problem in terms of dollar input per pupil, we recognized the legitimacy of permitting any school district wishing to do so to spend more on its educational program through local effort (local "leeway") provided such did not become "a device for diluting the State's mandated responsibility." [62 *N. J.* at 520]

ation" (*Id.* at 520), we did not foreclose that possibility. We indicated that the State could meet its obligation by financing education either on a statewide basis, with funds provided by the State, or, in whole or in part, by delegating the fiscal obligation to local taxation. *Id.* at 509–13. Should it choose the latter alternative, however, it would be incumbent upon the State, either legislatively or administratively "to define * * * the educational obligation and * * * *compel* the local school districts to raise the money necessary to provide that [equal educational] opportunity." *Id.* at 519 (emphasis in the original). If local government fails in that endeavor "the State must itself meet its continuing obligation." *Id.* at 513. The State aid plan under the current statute, *N. J. S. A.* 18A:58–4 (*L.* 1970, *c.* 234, hereafter the 1970 Act), was found inadequate because "not demonstrably designed to guarantee that local effort plus the State aid will yield to all the pupils in the State that level of educational opportunity which the * * * [Constitution] mandates." *Id.* at 519.

We concluded our opinion by ruling that relief would be prospective in nature, and we invited argument as to whether, pending legislative action, the judiciary could properly order redistribution of "minimum support" and "save-harmless" aid, *infra,* differently from the provisions of existing law, in furtherance of the constitutional imperative as the trial court had directed. *Id.* at 520–21; see 118 *N. J. Super.* at 280–81.

After hearing the parties and the *amici* (and pausing in deference to the doctrine of separation of powers in government), we decided that the statutory scheme would not be disturbed unless the Legislature failed by December 31, 1974, to enact legislation compatible with the Constitution and to be effective as of July 1, 1975. *Robinson v. Cahill,* 63 *N. J.* 196, 198 (1973). We withheld a ruling as to whether, if such legislation were not adopted, "the Court [might] order the distribution of appropriated moneys

toward a constitutional objective notwithstanding the legis-
lative directions." *Id.*

Despite considerable efforts by both the Executive and
Legislative Branches, no legislation was adopted by De-
cember 31, 1974, nor has been to date, although such efforts,
it is asserted, continue.

Numerous motions for intervention and for relief and
directions by the Court were filed by various parties both be-
fore and after December 31, 1974. On January 23, 1975, we
entered an order denying all motions for relief or directions
and making appropriate provision for hearing certain peti-
tioners for intervention as *amici curiae*. We decided that in
view of the time-exigency (and with continued deference to
the separation of powers, we must note) the Court would not
disturb the present statutory scheme for the school year
1975-1976 but would receive further briefs and hear argu-
ment on March 18, 1975, concerning appropriate remedial
action by the Court in various suggested particulars in rela-
tion to the school year 1976-1977 and subsequent years, look-
ing to a "final determination as to remedies" by the Court
in sufficient time to apprise each district by October 1,
1975, what the "State aid situation will be as to it, so far
as practicable, for the school year 1976-77."

We have received and carefully considered numerous
briefs and exhibits and have heard extensive arguments. It
is unnecessary for purposes of our present disposition of
the matter to outline in any detail all the positions taken.
They range from pleas by representatives of the General
Assembly and the Senate that the Court continue to stay
its hand, on the postulate that a solution of the constitu-
tional problem is exclusively for the Legislature and will
one day be achieved by it, to diverse proposals for the
present adjudication by this Court of all the substantive
components of a thorough and efficient education and the
financing thereof. They include proposals (which are some-
what varied in nature) by plaintiffs and by the Governor

of the State for redistribution of existing State aid for at least the school year 1976–1977 (in furtherance of the constitutional objective) pending legislative action. And they variously support or criticize guidelines proposed by the State Department of Education and recently published in 7 *New Jersey Register* 132 (April 1975), for the attainment by school districts of the goals of a thorough and efficient education.

Much of the material submitted by the parties and *amici* has been helpful to the Court, and was invited by the broad terms of the order of January 23, 1975. However, upon thorough deliberation on the matter, we have concluded that our present disposition should not extend beyond the delineation of a provisional remedy for the school year 1976-1977 should the other Branches of government fail to devise and enact a constitutional system of education in time for its effectuation for that school year.[4]

We do not now go further for several reasons. We continue to be hesitant in our intrusion into the legislative process, forced only so far as demonstrably required to meet the constitutional exigency. As well, it would be premature and inappropriate for the Court at the present posture of this complex matter to undertake, *a priori,* a comprehensive blueprint for "thorough and efficient" education, and seek to impose it upon the other Branches of government. Courts customarily forbear the specification of legislative detail, as distinguished from their obligation to judge the constitutionality thereof, until after promulgation by the ap-

---

[4]We do not at this juncture assume such a timely plan will not be forthcoming. Progress in that direction has already been made by the Department of Education and effort continues in the Legislature. If implementing legislation for financing and the attendant administrative process is completed before October 1, 1975, but not in time to permit review thereof by the Court by that date, the Court will then, in the light of the nature of the entire plan submitted, consider whether it may be permitted to go into effect for 1976–1977, with or without terms, or be deferred to subsequent years if ultimately sustained by the Court.

propriate authority. *Morrissey v. Brewer,* 408 *U. S.* 471, 92 *S. Ct.* 2593, 33 *L. Ed.* 2d 484 (1972). We have been as explicit as we reasonably could as to the nature of the constitutional deficiencies seen to exist in the present system. There is no responsible dissent from the view that implementation of the constitutional command is peculiarly a matter for the judgment of the Legislature and the expertise of the Executive Department. In other words, the Court's function is to appraise compliance with the Constitution, not to legislate an educational system, at least if that can in any way be avoided. We have measured and found wanting the existing scheme. No other is yet before us for adjudication.

Nor can we adjudicate on a piecemeal or hypothetical basis. The validity of the tentative guidelines recently published by the Department of Education cannot now be passed upon, inchoate and hortatory in nature as they are. They would have to be considered in context with such legislative provision as may be enacted for their fiscal implementation, unless the judgment of this Court is likewise to be only hortatory and futile in that sense.

Moreover, as already indicated, our opinion in *Robinson, supra,* 62 *N. J.* 473, noted the broad options open to the Legislature in discharging the constitutional requirement. Subject to the caveats there noted and here repeated, the selection of the means to be employed belongs to the other Branches of government, unimpeachable so long as compatible with the Constitution. *See, A. & B. Auto Stores of Jones St., Inc. v. Newark,* 59 *N. J.* 5 (1971) ; *Ind. Elec. Assoc. of N. J. v. N. J. Bd. of Exam.,* 54 *N. J.* 466 (1969) ; *Burton v. Sills,* 53 *N. J.* 86 (1968) ; *N. J. Chapt., Am. I. P. v. N. J. State Bd. of Prof. Planners,* 48 *N. J.* 581 (1967) ; *Two Guys from Harrison, Inc. v. Furman,* 32 *N. J.* 199 (1960).

We take this occasion to state our approval of the ongoing efforts of the Department of Education to establish

the components of a thorough and efficient system of education by formulation of standards, goals and guidelines by which the school districts and the Department may in collaboration improve the quality of the educational opportunity offered all school children. We assume that these efforts will move forward through the administrative process to a finality, and that the State, through the Commissioner of Education, will see to the prompt implementation of the standards, so determined, in the field. We would further expect that any problem attendant upon undue burdens on particular districts, in conforming to such standards, will have legislative attention. But by these comments we intend no present implication that any method of financing for the purposes stated, which would leave the present system of defraying the expense of education substantially unaltered, could fulfill the "thorough and efficient" constitutional norm.

What we have already said is not, of course, to imply that the provisional remedy for the year 1976-1977 we hereinafter order represents our concept of the full reach of our power, duty or responsibility in effectuating the promise of the Constitution to the school children of the State should the other Branches delay action beyond availability of a remedy in time for the school year 1977-1978. Nor does it at all imply compliance by itself with the constitutional standards. We reserve such questions for the appropriate occasion, which hopefully will not occur.

■ We thus turn to the question of an appropriate contingent or provisional remedy for at least the school year 1976-1977. We forthwith reject the submission that we should do nothing. It is past three years since the system was held unconstitutional in the Law Division. Our position that the court would act at least for 1976-1977 was implicit in the January 23, 1975, order. The need for immediate and affirmative judicial action at this juncture is apparent, when one considers the confrontation existing be-

tween legislative action, or inaction, and constitutional right. When there occurs such a legislative transgression of a "right guaranteed to a citizen, final decision as to the invalidity of such action must rest exclusively with the courts. It cannot be forgotten that ours is a government of laws and not of men, and that the judicial department has imposed upon it the solemn duty to interpret the laws in the last resort. However delicate that duty may be, we are not at liberty to surrender, or ignore, or to waive it." *Asbury Park Press, Inc. v. Woolley,* 33 *N. J.* 1, 12 (1960). We have mentioned inaction as well as action in importing constitutional violation, for as stated by Justice Proctor in *Cooper v. Nutley Sun Printing Co., Inc.,* 36 *N. J.* 189, 196 (1961) (adverting to the opinion of Chief Justice Marshall in *Marbury v. Madison,* 1 *Cranch* 137, 163, 2 *L. Ed.* 60, 69 (1803)):

> * * * [J]ust as the Legislature cannot abridge constitutional rights by its enactments, it cannot curtail them through its silence. * * * The Judicial obligation to protect the rights of individuals is as old as this country. [36 *N. J.* at 196; citations omitted]

██ ██ If then, the right of children to a thorough and efficient system of education is a fundamental right guaranteed by the Constitution, as we have already determined, it follows that the court must "afford an appropriate remedy to redress a violation of those rights. To find otherwise would be to say that our Constitution embodies rights in a vacuum, existing only on paper." *Cooper v. Nutley Sun Printing Co., Inc., supra,* at 197.

██ ██ We have given serious consideration to the idea of enjoining all State aid under the present unconstitutional system. That recourse would simplify the weighty problem of judicial power, as there is a concession by all that the Court may, and ordinarily should, enjoin the administration of a patently unconstitutional plan. But we are convinced that so radical a curtailment of obviously essential

State assistance to the school districts and its consequent harmful impact on vital educational programs, even if only for one provisional year, is not justified at this time in the light of all pertinent considerations.

The provisional remedy for the school year 1976-1977 we have decided upon follows, in principle if not in scope, the proposal for redistribution of State aid funds advocated before us by the Governor. The Governor's plan, presented as "the appropriate next step in this significant interchange between coordinate branches," would enjoin the present statutory distribution and distribute to the school districts more conformably to the constitutional norm the following categories of State aid funds:

1. Minimum support aid (*N. J. S. A.* 18A:58-5, subd. a) ($234,000,000 as of 1974-1975) ;
2. Save-harmless funds (*N. J. S. A.* 18A:58-18.1) ($7,600,000 as of 1974-1975) ;
3. Building aid, foundation program (*N. J. S. A.* 18A:58-23, 24) ($27,000,000 as of 1974-1975) ;
4. Atypical pupils aid (*N. J. S. A.* 18A:58-6) ($64,000,000 as of 1974-1975) ;
5. Transportation aid (*N. J. S. A.* 18A:58-7) ($46,000,000 as of 1974-1975) ;
6. Pension fund contributions by the State (*N. J. S. A.* 18A:66-1 *et seq.*) ($172,000,000 as of 1974-1975).

These items aggregate about $550,000,000 at the 1974-1975 level of appropriations. Under the proposed State budget for 1975-1976 those items would, for that year, total about $585,000,00. What they will amount to for 1976-1977 is not yet known. Minimum support aid provided in 1975-1976 $150 per resident weighted pupil in operating districts. Save-harmless aid assures every district no less aid for current expenses and building costs than it received in the school year 1972-1973. The titles of the other aid categories are self-explanatory. It is estimated that minimum support aid for 1976-1977 would approximate $165 per pupil.

The Governor proposes redistribution of all such funds in accordance with the incentive equalization aid formula of the relevant sections of the 1970 Act (*N. J. S. A.* 18A: 58–5, subd. b, 6.3), the operation of which was described in our prior opinion. 62 *N. J.* at 517–18. Essentially, that formula fixes a "guaranteed" equalized assessed valuation per weighted pupil (currently $43,000), and if the school district's *actual* corresponding valuations per pupil multiplied by the number of pupils there resident is less than the *guaranteed* valuations per pupil multiplied by the same number, the district receives State aid to the extent of the difference, multiplied by the net operating school tax rate. If the actual valuations are more than the guaranteed valuations no formula aid is given.

The Governor's position (and to this extent plaintiffs agree) is that the six categories of State aid enumerated, as presently distributed, are not compatible with the *Robinson* criterion of equality of educational resources for the pupils, whereas the incentive equalization formula is. He therefore urges that the whole be redistributed solely on the basis of the latter formula. Rough calculations offered on his behalf prior to argument purported to indicate that if applied for the year 1975-1976, this would have lifted the guaranteed valuation rate per pupil from the then existing $43,000, to a figure ranging from $66,000 to $72,000, depending upon the amount of appropriations for that year. If applied for the year 1976-1977 the figure would be larger because of increasing budgets and equalized valuations.

We are in accord with the Governor and plaintiffs as to the effect of redistribution of minimum support and save-harmless aid in accordance with the 1970 incentive equalization aid formula in tending to subserve the goal of equality of educational opportunity. The two named items leave existing arbitrary ratios of tax resources per pupil unaffected. The formula, on the other hand, in effect places all districts whose actual equalized valuations are below the guar-

antee-level on the same per-pupil basis in respect of supporting tax resources. The higher the guarantee-level the more districts come under the umbrella of such equality. Since reallocating minimum support and save-harmless equality of supporting resources per-pupil is fostered in that way.

We think, however, that the merits of the attack upon the relevance of items 3, 4 and 5 mentioned above to permissible constitutional standards is not as manifest, if sustainable at all, as in the case of minimum support and save-harmless aid. As to pension contribution aid, while this shares the asserted and justified characterization of the last mentioned items, we conclude that redistribution thereof at this juncture would be inadvisable. We believe there would be substantial legal and administrative confusion as to where responsibility would lie for raising employers' pension contributions under existing legislation if the legislative appropriations for that purpose were enjoined, not to mention risks to the solvency of the Teachers' Pension and Annuity Fund. Teacher and pensioner morale is a pertinent factor for consideration.

It is our order, consequently, that for the school year 1976–1977, in the contingency aforestated, minimum support aid and save-harmless funds shall not be disbursed as provided under the existing statutes, but shall be distributed in accordance with the incentive equalization aid formula of the 1970 Act. It is estimated these funds will approximate $300,000,000. According to calculations furnished us by the Department of Education, this should result, for the year stated, in guaranteed equalized valuations per weighted pupil of about $67,000.

We are not insensitive to the earnest pleas of those municipalities which will be disadvantaged by the redistribution here ordered because they have actual equalized valuations per pupil exceeding the prospective guaranteed valuations, yet are burdened by school populations requiring more than

average expenditures per pupil and perhaps some degree of extraordinary non-school burden (municipal overburden). The Department of Education has furnished us and the parties with a schedule of the respective gains and losses for 1976–1977 of the redistribution here ordered, and we have carefully weighed its effect. We have given consideration to a variety of possible adjustment factors, such as for municipal overburden, which might be applied to render this redistribution more theoretically equitable. Having regard to the urgent necessity of announcing our disposition at the earliest date posssible, and the debatability, complexity and uncertainty in effect of any adjustment factor which might be so considered, we have foregone efforts at refinement of the approach selected.

Study of the figures discloses a broad range of correlation between the gaining districts and districts having higher than statewide average school and general tax rates (equalized); *vice versa* as to the losing districts. (Concededly, these correlations are not invariably uniform.) Similarly, the gaining districts are generally the more urban areas, particularly afflicted by municipal overburden, and the rural districts, obviously ratables-poor. The remedy we apply is only for one year, and however short of a perfect plan, is at least attainable and a positive step toward the end result of full constitutional compliance. In any case, it is to be kept constantly in mind that our order may be averted by timely and adequate legislative and administrative action.

In sum, the present disposition represents our best present judgment as to an appropriate provisional and interim accommodation of the interests of the other Branches in their right to try to achieve accomplishment of the mutually desired constitutional remedy, of the interests of the school districts in providing adequate education in the meantime for their pupils, and of the solemn duty of this Court to enforce the Constitution.

In opposition to such action by the Court as thus ordered, it has been urged upon us on behalf of the Senate that the

"judicial power of the State does not encompass within it the power to redistribute funds appropriated by law even if in furtherance of a constitutional objective." This conclusion is erected upon the subordinate hypotheses (a) that under the literal terms of the Education Clause it is the Legislature and only the Legislature which has the power and right to provide for a system of thorough and efficient education; and (b) Art. VIII, § II, ¶ 2 provides that "no money shall be drawn from the State Treasury but for appropriations made by law" and that "[a]ll moneys for the support of the State government and for all other State purposes as far as can be ascertained or reasonably foreseen, shall be provided for in one general appropriations law covering one and the same fiscal year * * *."

The first premise is unacceptable on its face. The people in 1875 ordained the Legislature to be their agent to effectuate an educational system but did not intend to tolerate an unconstitutional vacuum should the Legislature default in seeing to their specification that the system be thorough and efficient. See *Asbury Park Press, Inc. v. Woolley, supra.* We have adjudicated such a default. Under emerging modern concepts as to judicial responsibility to enforce constitutional right there has been no paucity of examples of affirmative judicial action toward such ends. *Jackman v. Bodine,* 43 *N. J.* 453 (1964); *Swann v. Charlotte-Mecklenburg Bd. of Educ.,* 402 *U. S.* 1, 91 *S. Ct.* 1267, 28 *L. Ed.* 2d 554 (1971); *Griffin v. School Bd. of Prince Edward County,* 377 *U. S.* 218, 233–34, 84 *S. Ct.* 1226, 1234–1235, 12 *L. Ed.* 2d 256, 266–67 (1964); *Hawkins v. Shaw, Mississippi,* 437 *F.* 2d 1286 (5th Cir. 1971); *Kennedy Park Homes Ass'n v. Lackawanna, N. Y.,* 436 *F.* 2d 108 (2d Cir. 1970), *cert.* den. 401 *U. S.* 1010, 91 *S. Ct.* 1256, 28 *L. Ed.* 2d 546 (1971); *Mills v. Bd. of Educ.,* 348 *F. Supp.* 866 (D. D. C. 1972).

In the *Mills* case, *supra,* the Court held that constitutional right, *inter alia,* dictated that handicapped children were entitled to publicly supported education and that if funds, appropriated by Congress for general education only, were in-

sufficient to encompass the special need, there would have to be an equitable reallocation of the available funds toward that constitutional imperative. Thus, in order to enforce the Constitution, the judicial branch of the federal government reallocated funds differently from the appropriation thereof by the co-equal legislative branch of the same sovereignty. 348 *F. Supp.* at 876. The principle announced is directly apposite here.

In the *Jackman* case, *supra,* notwithstanding that our Constitution, as construed, authorized the Legislature to initiate the machinery for constitutional reformation of the system of legislative representation, and it would ordinarily be patently improper for the Court to do so, the judicial power was nevertheless invoked in the circumstances there obtaining. Legislative systems of representation of the people like New Jersey's having been held by the federal courts in violation of equal protection, a new system was required to be devised. The Court said:

> The duty to comply with the equal protection clause rests upon the three branches of State Government and upon the people of the State as well. The question is what part must be played by each.
> We think it clear that the judiciary should not itself devise a plan except as a last resort * * *. [43 *N. J.* at 473]

The Court fixed time limits for effectuation by the Legislature of a temporary plan for a constitutional system of legislative representation to meet the exigency of imminent elections, and plainly implied it would itself adopt and enforce a plan if the Legislature did not do so in time. *Jackman v. Bodine,* 44 *N. J.* 312, 316–17. See also *Asbury Park Press, Inc. v. Woolley, supra,* and particularly the concurring opinion of Justices Proctor and Schettino, 33 *N. J.* at 22, expressing a willingness to entertain an application for the court itself to order a reallocation of county representation in the General Assembly if the Legislature failed to do so, where population changes in the counties had made the existing allocation unconstitutional.

As to the Senate's reliance upon Art. VIII, § II, ¶ 2, the argument assumes there is a clash with the Education Clause, and the contention is that the former provision controls. We doubt the premise. The order we are making as to use of a portion of the State aid moneys in 1976–1977 does not call for the expenditure of appropriations not made by law. The funds, *ex hypothesi,* will be appropriated by the Legislature. They will still be used for educational purposes, but in a manner we have concluded to be an essential and minimal interim step in the enforcement of the Education Clause. If there remains a theoretical conflict between the strictures of the Appropriations Clause and the mandate of the Education Clause, we hold the latter to be controlling in these circumstances.

The argument is recast in terms of the doctrine of separation of powers, purportedly precluding judicial direction for expenditure of State moneys, that being exclusively for the judgment of the other Branches. Cited are such decisions as *Willis v. Dep't of Cons. & Ec. Dev.,* 55 *N. J.* 534, 536 (1970) and *Fitzgerald v. Palmer,* 47 *N. J.* 106, 108 (1966). These decisions essentially dealt with the extent of the judicial power to award or enforce money judgments or claims against the State or State agencies out of unappropriated moneys. They have limited pertinence here. The interest here at stake transcends that of an ordinary individual claimant against the State. It is that of all the school children of the State, guaranteed by the constitutional voice of the sovereign people equality of educational opportunity.

This Court, as the designated last-resort guarantor of the Constitution's command, possesses and must use power equal to its responsibility. Sometimes, unavoidably incident thereto and in response to a constitutional mandate, the Court must act, even in a sense seem to encroach, in areas otherwise reserved to other Branches of government. *Powell v. McCormack,* 395 *U. S.* 486, 89 *S. Ct.* 1944, 23 *L. Ed.* 2d 491 (1969). And while the court does so, when it must,

with restraint and even reluctance, there comes a time when no alternative remains. That time has now arrived.

So clearly does our constitutional duty bespeak the present obligation of affirmative judicial action, that we have no doubt that the order we now make is constitutionally minimal, necessary and proper.

The State Treasurer, the State Commissioner of Education and any other State officers concerned with the receipt or disbursement of moneys to be appropriated by the Legislature for local educational purposes for the school year 1976–1977 are hereby enjoined from disbursing minimum support and save-harmless funds designated by this opinion in accordance with existing law, and are directed to distribute and disburse said funds in accordance with the incentive equalization aid formula of *N. J. S. A.* 18A:58–5, subd. b, 6.3. These directions of course are subject to the contingency set forth in this opinion, namely the possible eventuation of timely and constitutionally appropriate legislative action.

So ordered; supplemental directions or relief may be applied for on notice. We retain jurisdiction.

PASHMAN, J. (concurring in part only and dissenting). Two years ago, when in *Robinson v. Cahill,* 62 *N. J.* 473 (1973) (*Robinson I*) this Court held the system of school finance presently in operation in New Jersey violative of the education clause of the Constitution of 1947, *N. J. Const.* (1947), Art. VIII, § I, ¶ 1, it chose to postpone imposition of a remedial order until January 1, 1975 so as to give the Legislature a reasonable period in which to satisfy the mandates of the Constitution. *Robinson v. Cahill,* 63 *N. J.* 196 (1973) (*Robinson II*). Earlier this term the Court again declined to impose an immediate remedial order in the expectation that the Legislature would perform its constitutional duties. *Robinson v. Cahill,* 67 *N. J.* 35 (1975) (*Robinson III*). The effect of this exercise of judicial self-restraint (which I considered unwarranted even at the time, *see Robinson III, supra* at 40

(Pashman, J. dissenting)) has been to delay implementation of any substantial relief until the 1976-77 school year, at the earliest.

By its terms, the education clause imposes on the Legislature the primary duty to "provide for the maintenance and support of a thorough and efficient system of free public schools." In permitting the grave constitutional violations recognized in the first *Robinson* decision to pass unremedied for so long, the Court has sought to render every possible deference to the primacy in this field granted to the Legislature by the Constitution. The Legislature, however, has not acted. We have long since reached the point beyond which continued toleration by this Court of the *status quo* would implicate the Court itself in these constitutional violations, *see Robinson III, supra* at 42–44 (Pashman, J. dissenting), for the judicial branch has an affirmative duty to act to protect the rights of citizens which are guaranteed by the Constitution, even — perhaps especially — in the face of the legislative inaction. *Cooper v. Nutley Sun Publishing Co.,* 36 *N. J.* 189, 196–97 (1961); *King v. South Jersey National Bank,* 66 *N. J.* 161, 177 (1974) (dictum); *see Asbury Park Press, Inc. v. Woolley,* 33 *N. J.* 1 (1960).

Some may have construed the Court's reluctance to impose a remedial order as abandonment of the constitutional principles announced in *Robinson I.* Such a construction would mistake judicial respect for the spirit of the constitutional principle of separation of powers for loss of judicial will to vindicate rights guaranteed by the Constitution. No error could be greater. Today's decision, despite its other shortcomings, is evidence that this Court remains resolved to exert its remedial powers to rectify the violations of the education clause identified in *Robinson I.* To fail to do so would involve a profound abdication by the Court of its constitutional responsibilities.

Necessarily, this course will carry the Court into hitherto unexplored territories in the realms of constitutional law and equitable remedies. It is a course, however, which was implicit and foreseen in our prior decisions in this matter. *See Robinson I, supra,* 62 *N. J.* at 520–21; *Robinson II, supra,* 63 *N. J.* at 198; *Robinson III, supra,* 67 *N. J.* 37–38. The fact that such a course requires investigation of novel and difficult questions of law, *see, e. g., Jackman v. Bodine,* 43 *N. J.* 453 (1964); *Asbury Park Press, Inc. v. Woolley, supra,* or that it may require the Court to make controversial or unpopular decisions, *Ridgefield Park v. Bergen County Board of Taxation,* 31 *N. J.* 420, 431 (1960); *cf. Cooper v. Aaron,* 358 *U. S.* 1, 78 S. Ct. 1401, 3 L. Ed. 2d 5 (1958), is no grounds for turning aside.

I concur in the general decision of the Court to order some form of relief for the 1976-77 school year and in its determination that it has the power to enjoin the distribution of "save-harmless aid" and of "minimum pupil aid" under the Bateman-Tanzman Act, *N. J. S. A.* 18A:58–1 *et seq.,* and to order redistribution of those moneys in accordance with the more equalizing "incentive-equalization" formula contained in *N. J. S. A.* 18A:58–5(b), as a first step toward remedying present violations of the education clause.

In my opinion, however, this remedy, while within the powers of the Court and adopted with a proper spirit of commitment to ultimate implementation of the education clause, is not commensurate with the magnitude and importance of the wrong. I would order relief both broader in scope and calculated to more directly implement the mandates of the education clause as construed by our prior decisions in this case.

I

This case concerns the inequality of educational opportunity that has resulted from the wide disparities in resources devoted to educational purposes in the various local

school districts in New Jersey. In *Robinson I, supra,* the Court did not hold that disparate educational expenditures were *ipso faclo* unconstitutional as a matter of constitutional equal protection. 62 *N. J.* at 482–501; *cf. West Morris Regional Bd. of Education v. Sills,* 58 *N. J.* 464 (1971), *cert.* denied 404 *U. S.* 986, 92 S. Ct. 450, 30 L. Ed. 2d 370 (1971). Rather the Court found that *N. J. Const.* (1974), Art. VIII, § I, ¶ 1 imposed upon the State the duty to insure that a certain minimum level of educational opportunity is provided every student.[1] 62 *N. J.* at 513–15. It held that while the State may delegate the actual administration of the public schools to local school districts, it cannot delegate the ultimate responsibility for "maintain[ing] a thorough and efficient system of public schools." *N. J. Const.* (1947), Art. VIII, § IV, ¶ 1. The fundamental constitutional defect in the present system of school finance was identified by the Court as abdication by the State of this responsibility.

[I]f the State chooses to assign its obligation under the 1875 amendment to local government, the State must do so by a plan which will fulfill the State's continuing obligation. To that end the State must define in some discernible way the educational obligation and must *compel* the local school districts to raise the money necessary to provide that opportunity. The State has never spelled out the content of the constitutionally mandated educational opportunity. Nor has the State *required* the school districts to raise moneys needed to achieve that unstated standard. Nor is the State aid program designed to compensate for local failures to reach that level. ⁂ [62 *N. J.* at 519; emphasis in the original].

---

[1]This is, of course, only one possible definition of equality of educational opportunity. *See generally* McDermott & Klein, "The Cost-Quality Debate in School Finance Litigation: Do Dollars Make a Difference," 38 *Law & Contemp. Prob.* 415, 416–23 (1974) ; Wise, "Legal Challenges to Public School Finance," 82 *School Rev.* 1, 15–19 (1973). The use of this definition by the Court throughout this litigation should not be understood as foreclosing the possibility that other definitions may be more appropriate to other circumstances to which the education clause applies.

Thus the education clause requires that the State, having chosen to delegate administration of public schools to local school districts, must prescribe statewide standards for the operation of those schools so as to insure that all children are guaranteed an opportunity for an education of a certain minimum quality. It must also establish a mechanism for compelling local compliance with such standards, and where, for financial reasons, a local school district cannot comply, it must provide a means for supplementing local resources. 62 *N. J.* at 513, 519.

In the present case, the failure of the State to promulgate and enforce such standards for educational quality has permitted the development of great disparities in the amount of resources devoted in the various local school districts to education — disparities which appear to have no educational justification and which are not responsive to the constitutional mandate of the maintenance of a "thorough and efficient" system of schools throughout the State but rather are merely a reflection of the great disparities in relative wealth of the various school districts. 62 *N. J.* at 515–20.

The ultimate object of any relief ordered by this Court must be to compel the State to assume these duties, which, to the grave injury of many children in this State, have gone long neglected. Until the State has at least adopted proper statewide standards, it is impossible for this Court to even determine to what degree the present disparities are resulting in inadequate education in some districts, although the findings of the trial court put it beyond question that lack of sufficient expenditures for education is seriously harming students in at least some school districts. *Robinson v. Cahill,* 118 *N. J. Super.* 223, 246–68 (Law Div. 1972).[2] In the

---

[2]The Court accepted the finding of the trial court that as a result of the disparities among districts in resources devoted to education, the State had failed to fulfill its obligation to provide a "thorough and efficient" system of education for all pupils. *Robinson I, supra,* 62 *N. J.* at 515–16. The relationship between expenditures on educa-

interim, the Court must move to eradicate at least the grossest disparities.

The redistribution of State "save-harmless" and "minimum pupil" aid ordered today is a step, albeit a small one, toward the accomplishment of such interim relief. Regrettably, the Court has not gone farther and redistributed all State aid to education and has chosen to rely exclusively upon the so-called "incentive equalization" formula, *N. J. S. A.* 18A:58–5(b), as its mechanism for reallocation of those funds which it does redistribute, without attempting to remedy the substantial shortcomings of that formula itself. More regrettably still, the Court has failed in today's decision to deal with ultimate constitutional violations at issue here. It has not acted at all to compel the promulgation of statewide standards of educational quality, an essential first step in remedying those violations, but has merely contented itself with interim relief, dealing only with the grossest symptoms of the failure of the State to meet its obligations and even with those only for a single year.

## II

The education clause imposes initial responsibility for formulation of statewide standards of educational quality upon the Legislature and, by implication, upon administrative agencies to which the Legislature properly delegates its authority. *N. J. Const.* (1947), Art. VIII, § IV, ¶ 1. These bodies have broad discretion in defining those stan-

---

tion and the quality of education provided has been a much mooted question among educators. *See, e.g.,* McDermott & Klein, "The Cost-Quality Debate in School Finance Litigation: Do Dollars Make a Difference?" 38 *Law & Contemp. Prob.* 415 (1974) ; Mosteller & Moynihan, eds. *On Equality of Education* (1972) ; Guthrie, Kleindorfer, Levin & Stout, *Schools & Inequality* (1971) ; Coleman, *Equality of Educational Opportunity* (1966). There can hardly be any doubt, however, that adequate financing is a necessary condition for an effective educational system, even if not a sufficient one. *Cf.* McDermott & Klein, *supra* at 429–30.

dards. It is not appropriate for the judiciary, which has no special expertise in matters of educational policy, to interfere with the exercise of this discretion except where the executive and legislative branches have altogether failed to establish standards or where the standards which have been established are plainly insufficient to meet the requirements of the Constitution.

The Legislature has expressly delegated the responsibility for supervision of the quality of the public schools to the State Board of Education and its administrative officer, the Commissioner of Education. *N. J. S. A.* 18A: 4–10, 18A:4–15, 18A:4–23, 18A:4–24. The Board and Commissioner are expressly authorized to inquire into the "thoroughness and efficiency" of any public school and to conduct any necessary tests and examinations:

*N. J. S. A.* 18A:4–24.

The commissioner shall, by direction or with the approval of the state board, whenever it is deemed to be advisable so to do, inquire into and ascertain the thoroughness and efficiency of operation of any of the schools of the public school system of the state and of any grades therein by such means, tests and examinations as to him seem proper, and he shall report to the state board the results of such inquiries and such other information with regard thereto as the state board may require or as he shall deem proper, but nothing in this section shall affect the right of each district to prescribe its own rules for promotion.

The Board is also expressly authorized to promulgate, *N. J. S. A.* 18A:4–15, and the Commissioner to enforce, *N. J. S. A.* 18A:4–23, rules and regulations implementing the education clause of the State Constitution. The powers of the Board and Commissioner under these statutes have in the past been construed very broadly. *See Jenkins v. Morris Tp. School District,* 58 *N. J.* 483 (1971); *East Brunswick Tp. School Board v. East Brunswick Tp.,* 48 *N. J.* 94 (1966); *cf. State Bd. of Education v. Netcong Bd. of Education,* 108 *N. J. Super.* 564, 571–73 (Ch. Div. 1970), aff'd 57 *N. J.* 172 (1970), *cert.* den. 401 *U. S.* 1013, 91 S. Ct. 1253, 28

L. Ed. 2d 550 (1971). The Board and Commissioner are thus statutorily empowered to formulate statewide standards of educational quality as well as being uniquely qualified to do so.

Therefore, while retaining jurisdiction in this Court, I would remand the case in part to the State Board of Education to formulate statewide standards for educational quality and to evaluate each school district to determine whether it is in compliance with those standards[3] and, if not in compliance, whether the district has the financial ability to comply without further State assistance.[4]

The type of standards required by the education clause may be inferred from the language of that clause and the cases interpreting it. "Thoroughness" and "efficiency" are ultimately measures of the effectiveness of the public school system in performing its function — educating the children who attend it. The former Supreme Court characterized the significance of the education clause in the following terms:

---

[3]This determination would necessarily involve an evaluation of the cost of achieving a "thorough and efficient" standard in each district and in the State as a whole.

[4]The doctrine of primary jurisdiction may demand that issues concerning the substantive educational standards required by the education clause arising in the course of this case be decided initially by the Board. *Glenn View Development Corp. v. Public Service Elec. & Gas Co.*, 57 N. J. 304 (1970) ; *Woodside Homes, Inc. v. Morristown*, 26 N. J. 529 (1958).

"Primary jurisdiction * * *" applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body. * * * [*United States v. Western Pacific R. R. Co.*, 352 U. S. 59, 63–64, 77 S. Ct. 161, 165, 1 L. Ed. 2d 126 (1956)].

This doctrine is, of course, merely one of priority of jurisdiction and operates to give the Court the benefit of the expert judgment of the Board and Commissioner. It does not relieve the Court of its ultimate responsibility to interpret and enforce the education clause. *Federal Maritime Bd. v. Isbrandtsen Co.*, 356 U. S. 481, 78 S. Ct. 851, 2 L. Ed. 2d 926 (1958) ; 3 *Davis, Administrative Law*, § 1901 at 3–6 (1958).

Its purpose was to impose on the legislature a duty of providing for a thorough and efficient system of free schools, capable of affording to 'every child such instruction as is necessary to fit it for the ordinary duties of citizenship. * * * [*Landis v. Ashworth*, 57 *N. J. L.* 509, 512 (Sup. Ct. 1895)].

Similarly, in *Robinson I,* we said:

The Constitution's guarantee must be understood to embrace that educational opportunity which is needed in the contemporary setting to equip a child for his role as a citizen and as a competitor in the labor market. [62 *N. J.* at 515].

The statewide standards[5] must, therefore, be cast in terms of the quality of education which the local school districts are actually providing to the students who attend them.[6]

That this type of standard is mandated by the constitution implies neither that other types of standards may not

---

[5]The promulgation of statewide standards does not necessarily mean that all school systems must conform to a single rigid pattern. It does mean that the State may not permit diversity to be accompanied by a dilution in the equality of education provided.

[6]The parties have briefed and argued at considerable length the merits of "input," "output" and "process" standards. *See* Tractenberg, "Reforming School Finance Through State Constitutions: Robinson v. Cahill Points the Way," 27 *Rutgers L. Rev.* 365, 421–22, nn. 276, 277 (1974). The distinctions among these types of standards may in application be more illusory than real. Ultimately a well-conceived educational system requires that educational goals be formulated, that decisions be made as to what inputs of human and material resources are required, that the resources be properly allocated among students according to their needs in light of the goals, and finally that the success of the system in achieving its educational goals be evaluated and, based upon that evaluation, the choice of educational goals, the decision as to resource needs, and the process of allocating resources to students be revised. *Cf.* Levin, "A Conceptual Framework for Accountability in Education," 82 *School Rev.* 363 (1974). *N. J. Const.* (1947), Art. VIII, § IV, ¶ 1 does not require either "input," "output," or "process" standards in the abstract. It does require that the State adopt educational goals which implement the constitutional requirement that the system be designed to equip each child for his role as a citizen and a competitor in the labor market and that the State adopt standards which focus upon the success of each school district in reaching those goals.

also be useful nor that the process of formulating and enforcing proper standards will be convenient and free of difficulties. Indeed the Commissioner has urged upon the Court the practical and theoretical obstacles to adopting and enforcing standards focused directly upon the question of whether public schools are in fact educating the students who attend them.[7] Nevertheless, that question is precisely the one that is of most importance to children, their parents, and, ultimately, to society as a whole.[8]

The product of such a remand would be both a set of standards and an evaluation of how much additional money would be needed to establish a "thorough and efficient" system of public schools in all school districts. I would set a timetable for the remand so as to enable the Court to hear any appeals from the decisions of the Board and to take any steps necessary to compel implementation of the Board's de-

---

[7]It should be noted that the State has already established a statewide educational assessment program. N. J. A. C. 6:39–1.1 et seq.; see Ascher, "Educational Assessment," N. J. E. A. Journal 22 (Nov. 1972). While the adequacy of existing standardized tests to evaluate educational accomplishment is open to serious doubt, see, e.g., McDermott & Klein, supra at 424–428; cf. Larry P. v. Riles, 343 F. Supp. 1306 (N. D. Cal. 1972) ; Note, "Legal Implications of the Use of Standardized Tests in Employment & Education," 68 Colum. L. Rev., 691 (1968) ; but see, Berkelman v. San Francisco Unified School District, 501 F. 2d 1264 (9 Cir. 1974), the establishment of a statewide assessment program is a necessary first step toward implementing standards of the type demanded by the education clause.

[8]The Board has announced its intention to promulgate regulations implementing the education clause. Proposed Rules for Thorough and Efficient Education, 7 N. J. Reg. 132 (a) et seq. (April 10, 1975). Since these regulations have not yet been promulgated in their final form it would be inappropriate to comment upon them in any detail. Before this Court, the Board and Commission have declared that their intention is to issue regulations which establish "process" standards. They define the "process" approach as "an educational system focusing on the delivery of resources to students in the most effective way, 'effective' being defined in terms of whatever works best for each individual learner." If this is indeed the thrust of the regulations to be issued, then they would not comply with the constitutional requirements.

cisions (with modifications by the Court, if any) for the 1976–77 school year. I would expect the Board to fully comply with the mandate of the Court upon such a remand in time for implementation of the Board's decisions in the 1976–77 school year.

At that time, it would be proper for the Court to consider what would be the most appropriate mode of exercising its power to compel provision of any additional resources needed to implement the mandates of the education clause if the Legislature had not acted in the meantime. *See generally Robinson III, supra,* 67 *N. J.* at 40–41 (Pashman, J. dissenting).

Such a remand, designed to lead to implementation of the mandates of the education clause beginning in the 1976–77 school year rather than at some indeterminate future date, seems to me both fully within the practical capacities of the State Board of Education and better calculated to fully remedy the constitutional violations identified in *Robinson I* than does imposition of mere interim relief.

## III

Had the Court chosen to order a remand of the type outlined above, we would in all likelihood not now be faced with the awkward problem of attempting on an *ad hoc* basis to eradicate the grossest disparities in educational expenditures. Nevertheless, since the majority has chosen to follow that route, the method it has adopted seems to me to call for some comment.

I have no doubt as to the Court's power to redistribute existing State aid for education so as to reduce disparities among the various school districts in the resources available for educational purposes. The arguments to the contrary are considered and properly disposed of in the opinion of the majority. *Ante* at 346–350.

The education clause, of course, does not require the State to subsidize local inefficiency or waste. Rather the State has a duty to insure that moneys granted to a local school district

are in fact properly used by that district to provide a "thorough and efficient" education for its pupils.

Even if I could approve the majority decision to order only interim relief, I would see no justification for proceeding as gingerly as does the Court today. The net effect of re-distributing "save-harmless" and "minimum pupil" aid under the "incentive-equalization" formula is disturbingly small. The Commissioner of Education estimates that those categories of aid will total only $303 million[9] in 1976–77 out of a total expenditure for public schools from all sources of $3.03 billion. Only $101 million of the money will actually be shifted from well-to-do districts to poorer ones. Thus we are effecting only about a 3% change in the overall allocation of educational resources.

The majority chooses not to redistribute State pension contributions to the Teachers' Pension and Annuity Fund, *N. J. S. A.* 18A:66–33; atypical pupil aid, *N. J. S. A.* 18A:58–6; building aid, foundation program, *N. J. S. A.* 18A:58–23, 24 or transportation aid, *N. J. S. A.* 18A:58–7, categories of state education aid which totaled approximately $309 million in 1974–75. At best these aid programs fail to respond to the problem of disparities in educational expenditures among districts which result from the gross interdistrict differences in resources available for educational purposes, thus diluting the small equalizing effect which the remedy ordered by the Court may have. Some of these programs seem to have the effect of actually magnifying those disparities. Transportation aid and atypical pupil aid are distributed to districts on the basis of actual costs, regardless of the differing ability of the various districts to obtain funds for these special services from local revenue sources. State pension contributions are made to all districts, regardless of district wealth, and may be even higher in wealthy districts, which offer higher teacher salaries, than in poorer districts. Distribution of

---

[9]This estimate assumes that the Bateman-Tanzman Act will continue to be fully funded.

building aid is somewhat better correlated with the relative wealth of the various districts, but the variation in aid among districts is not nearly so great as the disparities in their resources would require. All of these types of aid contribute more to the problem of disparities in educational expenditure than they do to its solution.[10]

The majority accepts as grounds for not redistributing these categories of aid, and most especially for not redistributing State pension contributions, the argument that including them in the remedial order would lead to "administrative confusion." One might expect that this argument, which has been dusted off, polished up, and put on display by the advocates of the *status quo* at every stage of this all too prolonged litigation, *see, e. g., Robinson III, supra,* would have begun to lose its allure.[11] Mere injunction and re-

---

[10]The situation in this case is thus very different from the one presented in *Gautreaux v. Romney,* 457 *F.* 2d 124 (7 Cir. 1972), where the proposal that funding of wholly unobjectionable programs be enjoined so as to stimulate correction of constitutional defects in other programs was rejected.

[11]The majority fears that the grant of any affirmative relief for this school year would create chaos in the budgetary process in local school districts. It is undeniable that a grant of affirmative relief by the Court for this school year would complicate the process of approval of local school budgets this spring. That process is governed by the various provisions of *N. J. S. A.* 18A:22, which sets out a timetable for formulation and adoption of these budgets. The Legislature, however, has already pushed the timetable back for this year. *L.* 1974, *c.* 191. Even this revised schedule is not so tight as to preclude further compression, either by the Legislature, or, in the absence of legislative action, by the Court itself. Oral arguments could be scheduled in mid-February and a decision announced shortly thereafter.

A certain amount of confusion and a great deal of dissatisfaction would undoubtedly result. The first can be ameliorated by diligence on the part of State and local officials. The second, the inevitable discordant accompaniment to possible change, should play no part in our decision.

The real question is: Can this Court, consistently with its obligations to uphold and to enforce the Constitution, trade the constitutionally guaranteed rights of hundreds of thousands of children to an equal educational opportunity for the possibility of avoiding some

distribution of these forms of aid need have no effect on bona fide obligations local districts have to teachers, special students, students needing transportation, or any one else. The sole effect is to shift the burden of financing these obligations from the State to local school districts, which may use any available source of revenue including redistributed State aid. There is no reason to believe that in the full year between now and July 1, 1976, administrative problems in making this shift could not be solved and the feared "confusion" mastered. Mere administrative inconvenience is paltry grounds indeed for failing to forcefully vindicate rights guaranteed by the Constitution. *Cf. Cleveland Board of Education v. La Fleur*, 414 *U. S.* 632, 646, 94 S. Ct. 791, 39 L. Ed. 2d 52 (1974); *Frontiero v. Richardson*, 411 *U. S.* 677, 690, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973).

Nor am I satisfied that the Court has acted wisely in choosing to employ the "incentive-equalization" formula contained in *N. J. S. A.* 18A:58–5(b) without significant modification as the mechanism for redistributing the State aid which is covered by its order.

The "incentive-equalization" formula is an example of what is sometimes described as "district power equalizing" formula. *See, e. g., Coons, Clune & Sugarman, Private Wealth & Public Education*, 202 (1970). Recognizing that a district with a small property tax base cannot provide adequate revenues for education even if it taxes itself very heavily, the "incentive-equalization" formula augments the power of the district to raise revenues by guaranteeing a certain minimum valuation per pupil. Thus, the State grants aid to the district equal to the amount the district would have raised by applying its school tax rate to the difference between the guaranteed valuation per pupil and the actual (equalized) valuation per pupil.

difficulties in meeting local budget-making deadlines. I do not see how this question can be answered in any way but in the negative. [*Robinson III, supra*, 67 *N. J.* at 42–43 (Pashman, J. dissenting); footnotes omitted].

The "incentive-equalization" formula is not a pure district power equalizing formula because it also seeks to take into account the fact that the cost of education is not the same for all students. The cost of high school education per pupil is greater than the cost of kindergarten education. A district, many of whose students fall into categories with high per pupil educational costs, may be unable to raise sufficient revenues to meet its educational needs even though another district with the same property tax base and same number of pupils, but whose pupils fall into categories with lower per pupil educational costs, could do so.

Therefore under the "incentive-equalization" formula, pupils are placed into different categories depending on the relative per pupil cost of educating them and pupils are "weighted" in the formula depending upon what category they fall into. *N. J. S. A.* 18A:58–2. Thus elementary school pupils are given a weighting of 1, kindergarteners are given a weighting of .75 and high school students are given a weighting of 1.3. Rather than providing a guaranteed valuation per pupil, the State under the "incentive-equalization" formula provides a guaranteed valuation per weighted pupil. In particular, the Legislature recognized that some pupils because of cultural, social and economic circumstances, may require more costly compensatory programs, and gave an additional .75 weighting for each child in the district receiving welfare (AFDC) benefits. *See generally, State Aid to School Districts Study Commission, A State School Support Program for New Jersey,* 39–40 (1968) (Bateman Report).

There is a third reason why a district, even though it taxes itself heavily, might not be able to raise enough revenues to meet its educational needs. Some areas, particularly urban areas, have exceptionally high non-educational expenses which must be financed through property taxes. Expenses which are exceptionally high in urban areas include county and municipal welfare, police and fire protection,

and sanitation. In these areas, revenues raised by property taxes which might otherwise be used for education, must be diverted to non-educational purposes. In addition, a substantial number of municipalities because of their size, density, and special social problems, have quite properly become involved in developing a broad range of public services, particularly in the area of human health and welfare, not provided by other smaller and more affluent communities. This, too, has contributed to the staggering rise in city expenditures, further eroding the one and the same tax base — local real estate ratables.

Hence a district situated in an area which has a heavy burden of non-education expenses may not be able to meet its educational needs, even though another district with the same property tax base, the same number of weighted pupils, and the same heavy tax rate could do so. The effects of this problem, which has been labeled "municipal overburden," on the ability of some urban areas to meet their educational needs is now well documented. *See, e. g., Robinson v. Cahill,* 118 *N. J. Super.* 223, 273 (Law Div. 1972). *Berke, Answers to Inequily,* 82–86 (1974); Grubb & Michelson, "Public School Finance in a Post-Serrano World," 8 *Harv. Civ. Rights — Civ. Lib. L. Rev.* 550, 564–66 (1973); Note, "A Statistical Analysis of the School Finance Decisions: On Winning Battles & Losing Wars," 81 *Yale L. J.* 1303, 1314–15 (1972); *Coons, Clune & Sugarman, Private Wealth & Public Education,* 233–36 (1970). Indeed, the State Aid to School Districts Study Commission (Bateman Commission), which drafted what subsequently became the Bateman-Tanzman Act, took express note of the problem in its report. *Bateman Report, supra* at 9, 42–43, 55, 97–99. The Bateman Commission, however, expressly chose not to deal with this problem in devising an aid formula and no provision was made for this problem in the Bateman-Tanzman Act. *Bateman Report, supra,* 8–9, 42–43, 54–55, a fact that was noted in

*Robinson 1, supra,* 62 *N. J.* at 519. Recent attempts to re-
form school finance in New Jersey have consistently treated
the problem of municipal overburden as an important de-
fect in the present system to be remedied. *See, e. g.,* Special
Message by Governor Byrne to the Legislature, *A Plan for
Education and Tax Reform in New Jersey,* 21–25 (June
13, 1974).

The majority concedes the significance of the municipal
overburden problem but declines to deal with the impact of
this problem on disparities in resources available for educa-
tion in many local school districts because (a) many dis-
tricts suffering most from the effects of municipal overbur-
den will receive increased aid anyway under the Court's or-
der and (b) the problem is too complicated to be dealt with
by the Court. *Ante* at 350–352. Neither of these asserted
reasons is well-founded.

As described above, the "incentive-equalization" formula
contained in *N. J. S. A.* 18A:58–5(b) was designed to deal
with two sources of disparity among local school districts
in ability to finance education: differences in local property
tax bases and differences in per-pupil education costs. The
third source of disparity, municipal overburden, is wholly
independent of the other two problems; even if those prob-
lems were completely solved, that of municipal overburden
would remain. The "incentive-equalization" formula was
not designed to deal with the problem of municipal over-
burden. That some districts that suffer from municipal over-
burden also suffer from insufficient tax bases and high per-
pupil costs and, so, benefit from increased use of the incen-
tive equalization formula is pure happenstance.[12]

---

[12]In general large cities do not suffer from inadequate tax bases
but do suffer badly from municipal overburden. Hence use of a dis-
trict power equalizing formula ordinarily tends to cause these cities
to lose state aid rather than gain it. This has been one of the prin-
ciple defects of the use of that approach. *Berke, supra* 83, 104–5;
Grubb & Michelson, *supra* 564–66. That major New Jersey cities
benefit from use of a power equalizing formula is a measure of the

To measure with perfect accuracy the impact of municipal overburden on the ability of urban areas to provide resources for education is an admittedly formidable task, *cf. Bateman Report, supra* at 55 (urging further study), but there are a number of simple ways of adequately approximating it.[13] The "incentive-equalization" formula can be adjusted to compensate in a rough way for municipal overburden without great difficulty.[14] The failure of the Court to attempt to

desperate condition of our cities, for it indicates that they suffer from low property values as well as municipal overburden. Jersey City (553), Paterson (560), Hoboken (562), Trenton (566), Newark (572) and Camden (575) all rank among the 30 lowest of the 578 operating school districts in equalized valuation per weighted pupil.

[13]Usable measures of the relative degree of municipal overburden include (1) the ratio of local revenues per capita used for non-school expenses to the statewide average of local revenues per capita used for non-school expenditures, Grubb & Michelson, *supra* at 565 & n. 39; (2) the ratio of the percentage of local revenues used for school purposes to the statewide average percentage of local revenues used for school purposes, *id.;* and (3) ratio of the local non-school tax rate to the statewide average local non-school tax rate. *See Bateman Report, supra* at 97.

[14]With suitable restrictions and adjustments any of the measures described in the previous footnote can be used to modify the value for the local property tax base used in the "incentive-equalization" formula so as to reflect the fact that in some districts much of the ostensible property tax base is unavailable for education purposes because of disproportionate non-educational demands upon it. In other words, rather than the formula providing that the State will grant aid equal to that which would be raised by applying the local tax rate to the difference between the guaranteed valuation and the local property tax base, the formula would provide that the State would grant aid equal to that which would be raised by applying the local tax rate to the difference between the guaranteed valuation and a figure more truly representative of the portion of the local property tax base which is actually available for educational purposes.

Thus, for example, the equalized valuation might be replaced in the "incentive-equalization" formula by the equalized valuation multiplied by the ratio of the percentage of local revenues used for school purposes to the statewide average percentage of local revenues used for school purposes (a measure of relative municipal overburden). *See, e.g., Bateman Report, supra* at 97–98; Grubb & Michelson, *supra* at 562–63; *Mich. Comp. Laws Ann.* § 388.1279 *et seq.* discussed in Grubb, "The First Round of Legislative Reforms in the Post-Serrano World," 38 *Law & Contemp. Prob.* 459, 484 (1974).

do so simply buries the cities of New Jersey a little deeper in social and financial difficulties.

## IV.

I regret that I am unable to concur more fully in the majority opinion. This case, born in controversy and reared in criticism, is one of rare importance for the people of New Jersey. It would be better if we could speak with a single voice. The relief ordered by the Court is a step forward and is welcome evidence of proper judicial commitment to ultimate implementation of the education clause, but it is only a very small step and not nearly adequate to the circumstances. It does incomplete justice at best.

It is the State's obligation to rectify any breach of the education clause. "If local government fails, the State government must compel it to act, and if the local government cannot carry the burden, the State must itself meet its continuing obligation." *Robinson v. Cahill, I,* 62 *N. J.* at 513.

That obligation is not met by unsuccessful efforts by the legislative and executive branches to devise a plan to achieve the results demanded by the Constitution, however arduous and bona fide those efforts may have been. To the children of New Jersey it matters not at all whether the State's failure to provide the educational opportunities guaranteed by the Constitution is the consequence of a deliberate policy of intransigence or merely the by-product of deadlock within the coordinate branches of government.

It has been suggested that the Legislature cannot reasonably be expected to act while the present depressed economic conditions continue. The dimensions of constitutional rights and duties, however, do not fluctuate with the rise and fall of the stock market; nor are those obligations of the State contingent upon the passing political expediency of raising revenues to comply. Economic claustrophobia cannot be permitted to overcome constitutional mandates. Obedience by the State to its organic charter is a perpetual duty — not

one to be deferred to some more propitious future date. Government must observe the law scrupulously. It cannot be a law-breaker.

This Court may not put its imprimatur on the consequences of the existing stalemate within the Executive and Legislature. We, too, are bound by the mandates of the Constitution. It would undoubtedly be more convenient to endure constitutional violations than to take the grave steps necessary to prevent or correct them. But if we long permit the guaranteed rights of the children of this State to be negated by governmental inaction, then we have failed to live up to our own constitutional obligations.

The Court has the power to go even farther in ordering relief than I have urged in this opinion. It has the inherent power to completely remedy the profound constitutional wrongs identified in *Robinson I, supra.* Delays, which are greeted with sighs of relief, are no substitute for action. We should not fear unpopularity. Any further delay or inaction is not to be tolerated. It is no longer enough for this Court to make ripples. To vindicate the rights guaranteed by the education clause we must make great breakers, and, if need be, tidal waves.

Despite the order the Court issues today, hundreds of thousands more children will be obliged to pass through inadequate school systems in this State without receiving the quality education to which they are entitled. I cannot concur in such a result.

MOUNTAIN and CLIFFORD, JJ. (dissenting). Today's decision marks the Court's entrance into the business of financing public education. There seems to be at least tacit agreement among us all that by reason of both constitutional law and the complexities of the subject matter, the judiciary is conspicuously unsuited for shouldering the burdens of that business, more appropriately left to the Legislature as unmistakably provided by the 1875 amendment to the 1844 Constitution, *Article* IV, § VII, ¶ 6, carried over to the 1947

Constitution in *Article* VIII, § IV, ¶ 1. Since the most meticulous search of our Constitution fails to disclose any textual warrant for the unprecedented step taken by the majority, justification for this acknowledged judicial encroachment on the legislative preserve must be sought elsewhere. And so the majority discovers "a legislative transgression of a 'right guaranteed to a citizen,'" *ante* at 347, in turn evoking a judicial "response to a constitutional mandate," *ante* at 354 presumably the "mandate" of *Article* VIII, § IV, ¶ 1 referred to above, directed solely to the *legislative* branch, since no other mandate is or possibly could be identified. By such diaphanous thread hangs the justification — indeed, the asserted necessity — for the Court's action.

Because we find ourselves in substantial accord with many of the majority's views, and because we recognize the desirability of as much unanimity as may be mustered in support of so significant a decision as today's, it is with some reluctance that we register our dissent. Few cases receive the exhaustive treatment, both by way of opportunity afforded any interested party to present his views and by way of frequent exchange of ideas among members of the Court, as has been accorded this one. The opinions of our colleagues are entitled to and do receive our profound respect. But so firm is our conviction concerning the proper scope of the judicial function at this juncture that we feel obliged to express our disagreement with the remedy here invoked. That disagreement focuses on the majority's conclusion that school aid funds appropriated or to be appropriated by the Legislature should be reapportioned by this Court in a manner which will allegedly attain a closer approximation of the kind of funding believed to be required to support "a thorough and efficient" education. We think the Court should rather stay its hand.

Initially it should be emphasized that in wrestling with this difficult problem it is of the utmost importance to bear in mind that as of this moment no one has defined what is

meant by "a thorough and efficient" education. As the majority correctly points out, it is not the function of this Court to establish the components of a thorough and efficient education. It is rather its duty to "appraise [the] compliance" of an educational system presented for judicial review as to constitutional sufficiency. We note with approval, as does the majority, that the State Commissioner of Education has prepared and published rules and regulations looking to this end. 7 *N. J. Reg.* 132 (April 1975). We are likewise aware that in each house of the Legislature bills have been introduced bearing directly upon the same subject matter.

In our view there has clearly been delegated to the Commissioner of Education the power, as there has also been allocated to him the responsibility, to take whatever steps may be necessary to define the meaning of the constitutional term "thorough and efficient," to lay down guidelines for the implementation of a program that will give it reality, and to see to it that the school districts of the State actually meet these requirements. *Bd. of Educ. of Twp. of E. Brunswick v. Twp. Council of E. Brunswick,* 48 *N. J.* 94 (1966) ; *Bd. of Educ. of Elizabeth v. City Council of Elizabeth,* 55 *N. J.* 501 (1970) ; *Jenkins v. Twp. of Morris School Dist.,* 58 *N. J.* 483 (1971). A clear if unstated effect of our earlier opinion in this case, *Robinson v. Cahill,* 62 *N. J.* 473 (1973), was to lay upon the Commissioner an immediate obligation to formulate rules designed to make precise the nature of the constitutional mandate and to provide for its implementation.

While we think it clear that as the law now stands the Commissioner of Education has both the power and the obligation to define what is meant by "a thorough and efficient" education and to see that our public school system meets prescribed standards, we are very conscious that in exercising such functions he is acting more or less as an agent of the Legislature. The latter is at any time com-

pletely at liberty to change or revoke his powers or to supersede them by the passage of legislation immediately directed to the issue. Some of the bills that have been introduced seem to have a close textual correlation with the Commissioner's proposed rules, suggesting that there is here a commendable cooperative effort being made by the two political branches of government.

Thus far we are in general agreement with the majority. When, however, it comes to the proposed reallocation of appropriated funds, as we have said, we take a different view. The problem rests in the concept commonly referred to as the doctrine of the separation of powers. It finds explicit expression in the New Jersey Constitution:

The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution. [*Art.* III, ¶ 1.]

The doctrine has not enjoyed a consistent development; it has been praised and it has been criticized. The uneven history of the concept may be noted but need not detain us here. The Supreme Court of the United States once said that all powers of government are divided into the executive, the legislative, and the judicial; and that it is "essential to the successful working of this system, that the persons entrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other." *Kilbourn v. Thompson,* 103 *U. S.* 168, 191, 26 *L. Ed.* 377, 387 (1881). Professor Kenneth Culp Davis believes that probably no more extreme statement of the theory of separation of powers can be found in Supreme Court opinions. 1 *Davis, Administrative Law Treatise,* § 1.09, at 64 (1958). Some years later, although in dissent, Justice Holmes suggested a somewhat different and rather more modern view:

It does not seem to need argument to show that however we may disguise it by veiling words we do not and cannot carry out the distinction between legislative and executive action with mathematical precision and divide the branches into watertight compartments, were it ever so desirable to do so, which I am far from believing that it is, or that the Constitution requires. [*Springer v. Government of Philippine Islands*, 277 *U. S.* 189, 211, 48 S. Ct. 480, 485, 72 *L. Ed.* 845, 853 (1928).]

The most significant challenge to the doctrine of the separation of powers came with the birth and lusty growth of administrative law. The story has been often told and needs no repeating. In modern times Congress and state legislatures have created regulatory agencies that have quite generally possessed legislative, judicial and executive powers. Thirty or forty years ago administrative agencies were attacked as being flagrant examples of a violation of the doctrine of the separation of powers, but the positive needs of government supported by flexible constitutional interpretation won the day. *Landis, The Administrative Process* 1–5 (1938) ; 1 *Davis, supra,* § 1.09 ; 1 *Cooper, State Administrative Law* 15 *et seq.* (1965).

Clearly today the doctrine of the separation of powers cannot be said to require a complete compartmentalization along triadic lines. More and more courts have come to recognize that where a practical necessity exists, a blending of powers will be countenanced, *but only so long as checks and balances are present to guard against abuses.* This was the view adopted by this Court in *Mulhearn v. Federal Shipbuilding & Dry Dock Co.,* 2 *N. J.* 356, 362–65 (1949).[1]

---

[1]In the course of his opinion for the Court, Chief Justice Vanderbilt had this to say:

The doctrine [separation of powers] * * * has not only been accepted as a cardinal principle of American constitutional law but has been relied upon from our earliest days as a nation as a fundamental and indispensable bulwark against despotism. * * * Lord Acton's aphorism merits quotation at this point: "Power tends to corrupt and absolute power corrupts absolutely." *Acton: Essays on Freedom and Power* (1948). The doctrine of the separation of powers is the great contribution of Anglo-American lawyers

As this Court more recently observed:

The doctrine of separation of powers must * * * be viewed not as an end in itself, but as a general principle intended to be applied so as to maintain the balance between the three branches of government, preserve their respective independence and integrity, and prevent the concentration of *unchecked* power in the hands of any one branch. [*David v. Vesta Co.*, 45 *N. J.* 301, 326 (1965) (emphasis in original).]

Professor Davis is also of the view that

* * * the true principle that should guide the allocation of power within the general framework is not the principle of separation of the three kinds of power but is the principle of check.

The danger is not blended power. The danger is unchecked power. [1 *Davis, supra*, § 1.09, at 68.]

Two examples may help to illustrate the point we make. It would probably be generally conceded that when the Legislature bestows judicial and executive powers upon an agency of its creation, there is a departure from the doctrine of the separation of powers, at least as seen in its most simplistic and restricted sense. So too, when judges make law in the process of deciding cases, it can properly be said that they are indulging in legislation and that this is theoretically repugnant to the doctrine of the separation of powers. Each of these practices, however, is now completely accepted and has indeed become commonplace. Significantly, however, in each of these instances the power being exerted by the branch of government to which that power is not intrinsically inherent is not unchecked. In the first example given, it will be noted that the various powers bestowed upon a judicial agency are all subject to judicial review. In the second example the judicial legislation undertaken by a court in the exercise of its adjudicatory function is immediately subject to the will of the legislature. The latter has the

to the prevention of absolutism and the preservation of the rights of the individual against the state. [2 *N. J.* at 363–64.]

last word; by appropriate legislation the rule of law laid down by the court can be at once changed or annulled.

But what of the power that we are considering here? We assume it would not be disputed that the power of appropriating public funds is commonly understood to be a legislative function. If the Court undertakes to reallocate funds the ultimate disposition of which has been fixed by the Legislature pursuant to the exercise of its acknowledged power of appropriation, how is this new-found power of the Court to be controlled? How can it be checked? We discern no way that this can be done. The power to appropriate is *singularly* and *peculiarly* the province of the Legislature. It is commonly thought of as an adjunct to the taxing power. If the courts are at liberty, for whatever reason, to reallocate appropriated funds in some particular case, why may not the courts do so in other cases as well? Who is to stay the judicial hand and what law is to guide its exercise? There are no discernible boundaries or limits beyond which the power might not be exerted provided only that the Court were made to feel that the exigency of the moment was sufficiently serious to justify the action. It seems to us that the exercise of such a power by the courts is indeed unchecked, and that it cannot be said to fall within any relaxation of the doctrine of the separation of powers that has thus far been countenanced. See generally Gibbons, "The Interdependence of Legitimacy: An Introduction to the Meaning of Separation of Powers," 5 *Seton Hall L. Rev.* 435 (1974); Wright, "The Role of the Supreme Court In A Democratic Society — Judicial Activism or Restraint?," 54 *Cornell L. Rev.* 1 (1968).

Quite apart from these compelling doctrinal considerations which work against the majority's remedy, we would point out that the federal decisions relied upon to support the existence (much less the exercise) of the judicial power to redistribute and *de facto* appropriate funds, *ante* at 352, are not in point. The separation of powers is an intra-govern-

mental concept, not an inter-governmental one. It refers to the allocation of power within a particular sovereignty or government, whether state or federal. *Cf. Baker v. Carr,* 369 *U. S.* 186, 210, 82 S. Ct. 691, 706, 7 *L. Ed.* 2d 663, 681–82 (1962). But the federal cases cited in the majority opinion all concern evaluations of the deeds or practices of another governmental entity not on the same level with the federal judiciary, *i. e.,* a state or subdivision thereof.[2] In not one case cited by the majority did affirmative conduct or idleness of a co-ordinate, co-equal branch confront the federal courts. The restraint normally imposed on the exercise of judicial power by the separation of powers doctrine is thus lacking in those instances. The sole decision mentioned by the majority involving this Court and a co-ordinate branch of government, *Jackman v. Bodine,* 43 *N. J.* 453 (1964), simply reiterates the "one-man, one-vote" principle etched into the law by the Supreme Court in *Baker v. Carr, supra,* and *Reynolds v. Sims,* 377 *U. S.* 533, 84 S. Ct. 1362, 12 *L. Ed.* 2d 506 (1964). Measuring the consistency of state activity against the command of the federal Constitution does not raise the spectre of the separation of powers. Nor were what Mr. Justice Stewart has characterized as the "intractable economic, social, and even philosophical prob-

---

[2] The Court's reliance on *Mills v. Bd. of Educ.,* 348 *F. Supp.* 866 (D. D. C. 1972), is misplaced. In *Mills* the District Court found a violation of equal protection in the school district's failure to provide an education for mentally handicapped children. The Board of Education asserted that no funds had been appropriated by Congress for that purpose. We suggest that the court was not persuaded by that contention because it was obvious that Congress intended no such restricted use of the appropriated funds and the Board was simply misinterpreting the appropriation law. However, even assuming the majority's interpretation of *Mills* is correct, we take notice of the fact the defendants there were not the executive and legislative branches of the federal government, but rather the Board of Education and the Commissioner of the District of Columbia. And they were directed merely to redistribute the funds made available to them.

lems" of a remedy, *Dandridge v. Williams,* 397 *U. S.* 471, 487, 90 S. Ct. 1153, 1163, 25 *L. Ed.* 2d 491, 503 (1970), so intense in *Jackman* as the problems generated by this Court's act of reallocating funds in the case at bar. And if the cited authorities represent what the majority characterizes as "emerging modern concepts as to judicial responsibility to enforce constitutional right," *ante* at 352, we suggest those concepts should for now be permitted to remain in their "emerging" stage rather than receive further nourishment from imprudent and untimely judicial activism.

Moreover, as the majority opinion points out, there is a second provision of the New Jersey Constitution which is also applicable. *Article* VIII, § II, ¶ 2, in pertinent part reads as follows:

No money shall be drawn from the State treasury but for appropriations made by law. All moneys for the support of the State government and for all other State purposes as far as can be ascertained or reasonably foreseen, shall be provided for in one general appropriation law covering one and the same fiscal year; * * *.

Again, we face a specific and explicit constitutional prohibition standing in the way of the action sought to be undertaken.

We recognize that it is difficult to deal in terms of constitutional absolutes. Constitutional interpretation is a delicate, sensitive and flexible process. Yet we cannot at the present time foresee a state of affairs or set of circumstances which would justify this proposed encroachment upon the prerogative of another branch of government.

Other reasons as well suggest that the Court should exercise self-restraint. Since this Court's decision several years ago there has been no lack of energetic and thoughtful attention given to the problem we are considering. It has been the almost constant concern and preoccupation of the Legislature and of the Commissioner of Education. While these considerable efforts have thus far been unsuccessful, we should nevertheless await their fruition. At the very

least the step here contemplated should not be taken before anyone yet knows what is meant by "a thorough and efficient" education. The elusive concept has many ingredients of which fiscal considerations are but one. No one knows today which school districts in the State may or may not be fully meeting their constitutional obligations. This point is made clear in the thoughtful and penetrating editorial entitled "Courts Cannot Encroach upon the Powers Belonging to the Executive or Legislative Branches of Government" appearing in the New Jersey Law Journal on April 24, 1975. (98 *N. J. L. J.* 356.) Surely, all constitutional restraints aside, as to any particular school district, there should first be a determination of legitimate fiscal insufficiency before supplying a judicially granted increase in state aid beyond the amount set by the Legislature, just as there should be a finding of overabundance of funds before invoking a judicially-mandated decrease.

Finally, we acknowledge that our position of restraint may very well be at odds with what may be seen as the most expeditious and efficient method of achieving final resolution of this troublesome case: exercise of the Court's presumed power itself to undertake, as the majority does today, the necessary financing. But restraint derived from a perceived limitation on the judicial power at this moment does maintain some semblance of a working balance between our three branches of government. Mr. Justice Brandeis once observed:

The doctrine of the separation of powers was adopted * * * not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy. [*Myers v. United States*, 272 *U. S.* 52, 293, 47 S. Ct. 21, 85, 71 *L. Ed.* 160, 242–43 (1926) (dissenting opinion).]

This doctrine deserves more than the ceremonial bow given it by the majority en route to its discovery of the

requisite authority to act. This power it draws *not* from the Constitution but from a conviction that since it must act, it must therefore also have the power to act. The present circumstances do not yet compel us to find that we must, out of sheer necessity, have that power. While ours is an imperfect resolution, it better preserves for the future the integrity of the institutions of this government.

*For the order*—Chief Justice HUGHES, Justices SULLIVAN, PASHMAN and SCHREIBER and Judge CONFORD—5.

*Against the order*—Justices MOUNTAIN and CLIFFORD—2.